Jackson & Perkins Company, Appellant, *v.*
Mushroom Transportation Company
Inc., et al.

Argued January 9, 1945. Before MAXEY, C. J., DREW,
LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

584

*John M. Smith, Jr.,* with him *Ronald A. Anderson,* for appellant.

*W. Bradley Ward,* with him *Lemuel B. Schofield,* for appellee, Mushroom Transportation Co., Inc.

*Edward A. Kelly,* with him *H. Eugene Gardner,* for appellees, Bickley's Auto Express and William Bickley.

OPINION BY MR. JUSTICE LINN, March 19, 1945:

Plaintiff appeals from judgment for defendants [1] in this suit for damages resulting from the freezing of plants shipped in interstate commerce and described by the shipper as "highly perishable." Jury trial was waived. The case was thoroughly considered by Judge MILNER; judgment was entered on his findings after they were approved by the court in banc; they have the effect of a verdict of a jury: *Athens Nat. Bank v. Ridgebury Twp.,* 303 Pa. 479, 483, 154 A. 791.

Plaintiff, January 5, 1942, shipped by motor truck thirty-two boxes, each 44 inches long, 20 inches high and 22 inches wide, containing about 16,000 dormant budded rose bushes, from Newark, New York, consigned to Florex Gardens, North Wales, Pennsylvania, the route being from Newark to Rochester, New York, thence to Philadelphia, thence to North Wales, Pennsylvania.

---

[1] Defendants had been joined pursuant to Pa. R. C. P. 2229 (b).

The initial carrier, Goetzman and Newman, issued a bill of lading or shipping receipt in the usual form.

The transaction is governed by federal law: *Chesapeake & Ohio Ry. v. Martin*, 283 U. S. 209, 213, 51 Sup. Ct. 453. The plants were frozen and of no value when delivered to the consignee, facts making a prima facie case against defendants. The defendants are liable unless the record shows they discharged their obligation to transport and deliver: 49 USCA sections 20(11) (12); 49 USCA section 319; compare *Chesapeake & Ohio Ry. v. Thompson Mfg. Co.*, 270 U. S. 416, 46 Sup. Ct. 318.

Plaintiff, in its statement of claim, avers that the shipment was "in a class known as 'perishable' "; that the boxes containing the plants ". . . bore instructions that the contents were perishable, easily frozen, and must be kept from extreme heat or cold. . . . 23. By reason of the negligence of the defendants in not protecting the said goods from cold and their negligent detention and delay in the transportation of the said goods, as aforesaid, the same were on their arrival at point of destination wholly spoiled and unfit for use, and wholly lost to the Plaintiff." In other words, plaintiff charges (1) negligence "in not protecting . . . from cold" and (2) negligent "detention and delay."

The learned judge, whose duty it was to find the facts, found that the damage ". . . was not caused by any negligent act or fault on the part of the defendants, but was caused by the inherent nature of the goods shipped, and natural causes, the risks of which the plaintiff, as shipper, assumed." Defendants were not insurers against loss resulting from the inherent nature of the plants.

We need not discuss plaintiff's argument on the burden of proof; the evidence is in the record; the only question now is whether the law was correctly applied to the evidence. If, on the evidence, a jury could not find for the defendants, the judgment must be set aside.

Defendant carriers had filed tariffs stating their services, rates and regulations. These tariffs bound all parties involved in the transaction and have the force and effect of an Act of Congress: *Rau v. Wilkes-Barre R. R. Co.*, 311 Pa. 510, 513, 167 A. 230; *Boston & Maine R. R. v. Hooker*, 233 U. S. 97, 34 Sup. Ct. 526.

On January 5, 1942, at about 8:30 A. M., at Newark, N. Y., plaintiff delivered the shipment to Goetzman and Newman, and received from them the bill of lading which is the basis of this suit. Goetzman and Newman transported the boxes in a closed truck to the terminal of defendant, Mushroom Transportation Company (hereafter called Mushroom) in Rochester, New York. This depot was a large garage containing loading and unloading platforms for handling freight. We quote the learned trial judge's statement of the movement of the shipment. On the same day Mushroom ". . . loaded about half of the shipment on a truck which left Rochester on January 5th, at eight o'clock, P. M., and arrived in Williamsport, Pennsylvania on January 6th at 3:45 A. M., and which after a fifteen minute layover in order to change drivers and refuel, left Williamsport at 4 A. M. and arrived in Philadelphia on January 6th at 1:30 P. M. The balance of the shipment was loaded on another truck which left Rochester on January 6th and after a similar stop at Williamsport left that City on January 7th at 5 o'clock A. M. and arrived in Philadelphia on January 7th at 11:30 A. M. These trucks were of the 'closed van type with a closed top' and two full length rear doors, with a tail gate which closed over the rear doors and completely sealed the rear of the vans. The Mushoom Transportation Company had only one truck scheduled for the Philadelphia run on January 5th, and this truck had only capacity for about one-half of the shipment or 19 boxes. The remaining thirteen boxes were kept on a dock in the back part of its garage until they were shipped the next day. The dock was described as a platform built out about 60 feet from the back wall

of the garage which was 200 feet long. The trucks or vans in which the boxes were shipped were neither heated nor refrigerated. The side walls of the vans were of metal ribbed and lined with a veneer, affording an air pocket of about 4 or 6 inches between the metal and the veneer. The back doors were also metal, veneered inside and were solid.

"Bickley's auto express was notified by Mushroom Transportation Company to pick up the first shipment on January 6th, 1942, at about 3 o'clock P. M. Bickley's sent a truck to Mushroom Transportation Company's depot at 1303 N. Front Street, in Philadelphia, and the driver reported with the first shipment at Bickley's Philadelphia platform at 407 Callowhill Street, Philadelphia, at about 4:30 P. M. and was instructed by Mr. Bickley to take the loaded truck to Bickley's garage at Jenkintown, Pennsylvania. The cases were taken from the platform of the Mushroom Transportation Company in Philadelphia about 4:30 P. M. on January 6th. It is only about a five minute drive from Mushroom Transportation Company's platform to Bickleys. The drive to Jenkintown garage takes about 35 minutes. Mr. Bickley testified that it was too late to make the same day delivery, so the truck was sent to Bickley's Jenkintown garage, where it arrived at about 5:30 o'clock P. M. and was kept there overnight. The truck was a panel body closed truck, with a solid top and the rear was closed by a slotted gate over which a tarpaulin was drawn. The garage at Jenkintown was constructed of stone and brick with a capacity of about 10 trucks, and is equipped with one door on each side by which it may be closed. The walls are 18 inches thick. It is an enclosed garage. It is not heated.

"On January 7th at about two o'clock P. M. Bickley was notified by Mushroom Transportation Company that the second shipment had arrived. Bickley picked up this shipment at about 4:30 o'clock P. M. and sent the truck to the Jenkintown garage where it was kept overnight.

The second shipment apparently was made in the same type of truck as was the first shipment. The first shipment was forwarded from Jenkintown on January 7th at about 7:30 o'clock A. M. and reached North Wales at 8:30 or 9 o'clock A. M. The second shipment was sent out to North Wales at about the same time the next day, January 8th. The trucks were not heated nor refrigerated."

The southern terminus of the route of Mushroom Transportation Company in Pennsylvania, is Philadelphia; North Wales, the destination of the shipment is not on Mushroom's tariff route. The bill of lading provided that each carrier ". . . agrees to carry to its usual place of delivery at said destination, if on its own road . . . otherwise to deliver to another carrier on the route to said destination." When Mushroom brought the shipments to its terminal in Philadelphia, it was required, by the contract, to deliver them to "another carrier on the route to said destination." To comply with that obligation, Mushroom delivered them to the other defendant, William Bickley, trading as Bickley's Auto Express, a carrier who delivered at North Wales. The learned judge was therefore right in holding that Bickley's Auto Express was not performing a mere switching service but was participating in the line haul as delivering carrier: 49 USCA section 20(11).

The record contains a stipulation signed by counsel for the parties: "1. That the average mean temperature prevailing in Philadelphia, Pennsylvania, on January 6, 1942, was fifteen degrees above zero; . . . on January 7, 1942, was eighteen degrees above zero; and . . . on January 8, 1942, was eleven degrees above zero . . ." They also stipulated that the meteorological summary of the Weather Bureau of United States Department of Commerce, ". . . may be considered by the hearing Judge with the same force and effect as though the original records had been produced and read into evidence at the trial of the case." We have examined this summary and observe that the maximum temperature

on January 6th was 19° and the minimum 11°; for January 7th, the maximum was 22° and the minimum 14°; for January 8th, the maximum was 16° and the minimum 6°.

The plants had been grown in California, and when delivered by the plaintiff to the initial carrier, were in the same boxes in which they had been received by plaintiff from California by rail some weeks before, except that plaintiff placed a double wrapping of paper on the boxes. The manetti roots, on which the rose bushes were budded, were packed in moist moss (called, by a witness, "spagma moss") to protect and nourish the roots, and the upper part of the plant, described as "about six or seven inches long," was covered with excelsior to allow circulation of air. Plaintiff had placed on each box stickers or labels stating, "This Box Contains Live Plants,—Highly Perishable,—Must Be Kept From Extreme Heat or Cold,—Easily Frozen,—Transfer Points Please Protect From Extreme Heat or Cold." Each also contained a sticker containing the words, "Perishable! Keep From Heat or Cold."

When the shipments were delivered at North Wales, almost all the plants were frozen and the shipment was worthless.

Defendants operated no heated trucks and had no heated terminal stations; the freight tariffs provided for transportation in unheated trucks and contained no provision that shipments at rest in their terminals would be protected by artificial heat. The consignor and the consignee were bound by the tariffs; the regulation against unlawful discrimination prohibited the carriers from rendering service not provided for in the tariffs. The evidence supports the fact, implicit in the conclusion of the learned judge, that defendants omitted nothing, provided for by their tariffs, that would prevent subjecting the plants "to extreme heat or cold," while in transit or at rest. The evidence is that in defendant's Rochester terminal, they were kept at an appropriate place until loaded into the truck for transportation. The

fact that the shipment went forward in two parts, instead of at the same time, apparently had nothing to do with its freezing because both shipments, though transported a day apart, were frozen when delivered at destination. If anything, the inference from the division of the consignment and its shipment in two parts on successive days on both of which the plants froze, would be that the transportation in unheated vehicles during the low temperature prevailing and to be expected at that time of the year was an error of judgment on the part of the shipper. The stop at Williamsport for refueling, etc., was a contemplated necessity of the transportation and not inconsistent with defendant's obligation. The time taken for their transfer, at the Philadelphia terminus, to Bickley for transportation to North Wales, was not unreasonable as is implied in the learned judge's conclusion. Bickley had no night delivery service and therefore took the shipment to his garage at Jenkintown, about one-third the distance to North Wales, where they were kept in the closed truck in a closed garage which constituted his terminal station. There is no evidence of detention or delay.[2]

There was expert evidence that rose bushes, packed as these are described to have been packed, would, unless unduly exposed, stand a temperature of 15° and even lower for a short time. The weather bureau records show the temperature fell to 6°. The expert also thought that "to bring about the condition" in which they were delivered, would require the plants to be subjected to "five or six hours, or possibly seven hours exposure" of the boxes. The evidence supports a finding that there were no such long periods of exposure. The value of the opinion evidence was, of course, for the trier of facts: compare *Ray v. Philadelphia*, 344 Pa. 439, 25 A. 2d 145; *Com. v. Shults*, 221 Pa. 466, 70 A. 823. The plaintiff

[2] Section 2(a) of the bill of lading provided: "No carrier is bound to transport said property by any particular train or vessel, or in time for any particular market, or otherwise than with reasonable dispatch."

specified on the boxes that the plants were "highly perishable" and were "easily frozen." From the evidence, we cannot say that the learned judge erred in finding as facts that, within the limits of the service proposed by their tariffs, defendants had kept the shipments "from extreme heat or cold." We must reject appellant's argument that this was not a perishable shipment, though so descibed by it. To keep the roots alive, they were packed in moist moss. This moisture froze and destroyed the roots. The consignee testified "the roots were frozen." The degree or extent of the freezing is indicated by part of another answer given by this witness: "Some of the boxes were frozen sufficiently that we had to use the strength of an ordinary man's hands to break the moss . . ." It is common knowledge that moisture subjected to low enough temperature will freeze, whether it be the moisture in moss around such roots or moisture in fruit and vegetables.[3] This moisture constituted an inherent infirmity during freezing weather exactly as the moisture in fruit and vegetables constituted an infirmity during freezing weather, or during excessive heat. The defendants' tariffs did not provide that defendants must insure against the effect of this natural law. The court found they omitted no duty of care.

The evidence supports the conclusion that the damage resulted from the shipment of property liable to freeze during the low temperatures stated above, in unheated transportation facilities and that defendants performed their contract of carriage without negligence.

Judgment affirmed.

---

[3] Compare *Blodget Co. v. N. Y. C. R. R. Co.*, 261 Mass. 365, 159 N. E. 45; *Clemons Produce Co. v. Denver & R. G. R. R.*, 203 Mo. App. 100, 219 S. W. 660; *McGovern v. Ann Arbor R. R. Co.*, 165 Wis. 525, 162 N. W. 668; *Standard Pickle Co. v. P. M. Ry. Co.*, 222 Mich. 639, 193 N. W. 300; *Schwartz v. Erie R. R. Co.*, 128 Ky. 22, 106 S. W. 1188; *White v. Minneapolis etc. Ry. Co.*, 111 Minn. 167, 126 N. W. 533; *McGrow v. B. & O. R. R.*, 18 W. Va. 361; *Tri-State Fruit Growers Ass'n v. St. L. & S. F. Ry. Co.*, (Mo. App.) 264 S. W. 445.