## Claughton, Appellant, *v.* Bear Stearns & Company.

482

Argued May 6, 1959. Before Jones, C. J., Bell, Musmanno, Jones and Cohen, JJ.

reargument refused December 30, 1959.

*Francis W. Sullivan,* with him *Sydney C. Orlofsky,* and *Strong, Sullivan, Saylor & Ferguson,* for appellant.

*Owen B. Rhoads,* with him *Norma L. Shapiro,* and *Barnes, Dechert, Price, Myers & Rhoads,* for appellee.

Opinion by Mr. Justice Benjamin R. Jones, October 21, 1959:

This appeal involves a question of the fidelity and loyalty to its principal of a stock brokerage concern which acted as agent for a decedent's estate in the sale of a large block of the common stock of a railroad company.

Edward Claughton upon his decease in Florida on May 10, 1955 was the owner of 509,500 shares of the common stock of the Missouri-Kansas-Texas Railroad Company (herein called MKT).[1] At the time of his death 502,200 of these shares (non-income producing) were pledged to twelve banks and brokers to secure a total indebtedness of over $5,000,000 which indebtedness bore an average annual interest rate of $4\frac{1}{2}$ per cent. Lillian Claughton, the decedent's widow and personal representative, was faced with financial conditions which necessitated a sale of decedent's MKT stock in order to satisfy the estate's obligations. Mrs. Claughton, her counsel and others on her behalf made efforts to investigate the possibilities of protection of the value of this stock and to effect a sale thereof.

On June 14, 1955, Mrs. Claughton, her son, her brother, and several attorneys, including her principal attorney, Roy Sadler, Esq., met in Miami, Florida, with one Salim Lewis, a partner in a New York stock brokerage firm known as Bear Stearns and Company (herein called Bear Stearns). The purpose of that meeting was to discuss the possible sale of 525,000 shares of the MKT common stock.[2] After some discussion Lewis was then granted a "modified exclusive agency" to effect a sale of this stock, i.e., Mrs. Claughton reserved the right to deal with persons who might contact her directly or with persons previously contacted on her behalf by Attorney Sadler without the

---

[1] These shares represented approximately ⅝ths of the outstanding MKT common stock (808,971). This common stock was subordinate to MKT'S cumulative 7% preferred stock, 667,000 shares of which outstanding in June 1955 had accrued dividend arrearages of $150.50 per share. Both the preferred and the common stock had one vote per share.

[2] While the Claughton estate owned only 509,500 shares, other interests closely allied with Claughtons owned an additional 15,500 shares.

payment of a commission to Lewis and his firm. Lewis was given no authority as to the price at which this stock was to be sold but was authorized to attempt to secure the best price available, the ultimate sale price to be subject to Mrs. Claughton's approval. On the date of the meeting the market price was 13 3/4-14. At that meeting someone suggested a price of $15 as appropriate, although the source of this suggestion is controverted.[3]

On June 23, 1955 Lewis telephoned Attorney Sadler to inform the latter that Pennroad Corporation (herein called Pennroad) and State Street Investment Corporation (herein called State Street) had evinced an interest in purchasing the stock, but they required of Lewis a firm price.[4] Lewis recommended to Attorney Sadler a price of $13.75 per share, less taxes and commissions of $18.75 per hundred shares, and that said price be fixed for 24 hours. It is to be noted that Bear Stearns itself had agreed to purchase, with Pennroad and State Street, 50,000 shares of the block of stock; *when* this information was imparted to Mrs. Claughton and Attorney Sadler is a controverted matter. On that same date, Mrs. Claughton called Lewis and authorized the sale of the stock at the price recom-

---

[3] The market for MKT common stock was "thin" and the "short" position relatively high. The Claughton interests had been advised by Professor Moore of Yale University and Attorney Sadler that in their opinion MKT common stock had only a "long term speculative value" and was generally overpriced but that the "control" factor implicit in the ownership of such a large block of stock might warrant a price higher than the market price.

[4] R. E. Thomas of Pennroad and W. F. Merton of State Street testified that they felt that, because of the size of this block of stock, the then market price was high, the former believing that $10-$11 would be a proper price, but that Lewis had stated that, representing the seller, the price would have to be around the current market price.

mended by Lewis. Several hours later Lewis called by telephone and stated that he could not close the transaction within 24 hours and desired an extension of the time to keep open this offer until midnight June 27, which extension was granted.[5]

On June 27 Lewis called Attorney Sadler and informed him that the Claughton offer had been accepted. On June 28 written telegrams were exchanged between the parties by which Bear Stearns, Pennroad and State Street offered to purchase and Mrs. Claughton accepted their offer upon the basis of $13.75 per share less taxes and a commission of $18.75 per hundred shares. Later that same date in Florida a written contract was drawn by the Claughton attorney and an attorney selected by the former to act for Bear Stearns; this contract was executed by Mrs. Claughton, as the seller, and by an Attorney Keith, as the agent for Bear Stearns. On June 29, Mrs. Claughton, in her capacity of executrix, petitioned the Dade County Probate Court in Florida for its approval of the sale of the estate stock, setting forth, inter alia, in such petition the price offered, that said price closely approximated the average market price for said stock on the New York Stock Exchange over the past month, that the market for the stock was "thin", that the stock could not be sold except at private sale without incurring great loss and finally that she, Mrs. Claughton, believed "said offer represents the best price obtainable for said stock and that it is to the best interests of the estate that said offer be accepted". The Dade County Court, upon these representations, approved the sale.

---

[5] The extension was requested at the instance of Pennroad and State Street to enable their representatives to meet MKT's president so as to avoid any possible unfriendly attitude in that quarter.

Bear Stearns, acting in the dual capacity of agent for both the seller and the purchaser, charged both the seller, the Claughton Estate, and the buyers, Pennroad and State Street, the normal brokerage commissions. In order to effectuate a tax saving, Bear Stearns arranged so that the amount of both commissions would be deducted from the sale price of $13.75 less taxes with the result that, out of its own funds, Bear Stearns paid $10 per share[6] for the 50,000 shares which it purchased.

Since the New York Stock Exchange rules require that its members obtain the Exchange's permission before effecting an "off the Exchange floor" transaction in a listed stock, Lewis secured on June 28th the approval of the transaction from the Chairman of the Board of the Exchange, revealing to the Exchange that Bear Stearns was charging a commission to both the buyer and seller as required by the Exchange rules, and that the sale price corresponded to the then market price. Settlement of the sale and purchase of the entire block of 525,000 shares was made by the Guaranty Trust Company of New York on July 5, 1955. Mrs. Claughton on behalf of the estate as the result

---

[6] Pennroad and State Street paid for the 475,000 shares purchased by them $13.75 per share, plus a commission to Bear Stearns of $.1875 per share, i.e., $13.9375 per share, or a total of $6,620,-312.50. Bear Stearns became obligated to pay $13.75 per share for the 50,000 shares purchased by it from the Claughton Estate ($687,-500). Bear Stearns was entitled to receive a commission in the amount of $18.75 per one hundred shares for 525,000 shares ($98,-437.50) from the Claughton interests and $18.75 per hundred shares for 475,000 shares from Pennroad and State Street ($89,062.50), or total commissions of $187,500. The amount Bear Stearns was obligated to pay ($687,500) less a credit in the amount Bear Stearns was entitled to receive in commissions from both seller and buyer ($187,500) resulted in the payment by Bear Stearns at the settlement of $500,000, or $10 per share.

of the sale of 509,500 shares of MKT common stock received $6,869,333.75.[7]

On July 22, 1955 Mrs. Claughton's counsel wrote to Bear Stearns and complained that it had violated its duty of loyalty and its fiduciary relationship to the Claughton Estate. The onus of the Claughton complaint against Bear Stearns is that the latter acted in a dual capacity of agent for both buyer and seller, charged double commissions, participated in the sale itself for its own interest and failed to secure an adequate price for the stock, all without the knowledge and consent of its principal-seller.

On November 14, 1955 Mrs. Claughton, in her representative capacity, instituted an assumpsit action against Bear Stearns wherein she claimed damages because of alleged fraudulent and deceitful acts on the part of Bear Stearns in the amount of $4,146,712.27 measured in the following manner: (a) the difference between the best price available, 21⅝ per share, less taxes and commission, and the actual sale price of 13 3/4 per share less taxes and commission, (b) the commission paid to Bear Stearns by the estate, $95,-531.25 and (c) the commission received by Bear Stearns on the estate's stock from Pennroad and State Street $74,839.22. Upon issue joined the matter was heard before Judge (now Justice) Bok without a jury and after hearing judgment was entered for Bear Stearns. From the entry of that judgment we have this appeal.

In passing upon the propriety of the entry of this judgment certain principles must guide our review:

---

[7] It is to be noted that, after payment of the principal and interest accrued on loans and for which the said stock had been pledged as collateral, the Claughton Estate received approximately $1,162,796.55, plus the release of additional collateral of 28,200 shares of Chicago and Eastern Illinois stock.

(1) where a trial judge sits without a jury, his findings of fact, approved by a court en banc, possess the conclusive equivalence of a jury verdict and, if such findings of fact are supported by the evidence, we neither overrule such findings of fact nor substitute our judgment for that of the trial judge: *Perletto v. Lancaster Avenue Building and Loan Association et al.*, 353 Pa. 366, 45 A. 2d 10; *Genetti v. Genetti*, 351 Pa. 169, 40 A. 2d 413; *Jackson & Perkins Company v. Mushroom Transportation Co. Inc. et al.*, 351 Pa. 583, 41 A. 2d 635; *Athens National Bank v. Ridgebury Township*, 303 Pa. 479, 154 A. 791; (2) if, however, the findings of fact are clearly or manifestly erroneous or were arbitrarily made or if the record indicates that the trial judge failed to comprehend and understand the evidence, such findings of fact may be overruled: *Park Drive Manor, Inc. Tax Assessment Case*, 380 Pa. 134, 110 A. 2d 392; *Biddle v. Biddle*, 363 Pa. 426, 70 A. 2d 281; *Commonwealth ex rel. Department of Justice v. Socony-Vacuum Oil Co.*, 352 Pa. 527, 43 A. 2d 98; *McDonald Construction Co. v. Gill et al.*, 285 Pa. 305, 132 A. 368; (3) particularly is this rule applicable where the findings of facts are predicated upon the credibility of the witnesses and the weight of their testimony: *Jones v. Steinberg*, 178 Pa. Superior Ct. 517, 115 A. 2d 803; (4) one who acts in the capacity of an agent is precluded from acting as agent for both parties to a transaction unless such double representation is known to the parties and not objected to by them: *Warner Company v. MacMullen*, 381 Pa. 22, 112 A. 2d 74; *Rossi v. Firemen's Insurance Co.*, 310 Pa. 242, 165 A. 16; (5) the burden is upon the agent to establish by clear and satisfactory proof that his principal knew of the dual agency at or before the completion of the transaction and failed to object thereto: *Warner Company v. MacMullen*, 381 Pa. 22, supra; *Sarshik v. Fink*, 292 Pa. 256, 141 A. 39; *Rice v. Davis*,

136 Pa. 439, 20 A. 513; *Marshall v. Reed*, 32 Pa. Superior Ct. 60.

The instant trial judge filed two opinions, one entitled "Memorandum of Findings" and the other "Opinion". While appellant argues that the trial judge "failed to state the facts found by him separately and distinctly and failed to clearly state the conclusions of law upon which he relied . . . ., in accordance with the requirements of the Act of April 22, 1874" such argument is without merit both upon this record and under the law. The Act of April 22, 1874, P. L. 109, 12 PS §689, was repealed by the Act of June 25, 1937, P. L. 2090, §1, 12 PS §695, insofar as it related to trials by a court without a jury in the Common Pleas Courts of Philadelphia County; *Chadwick v. Hepburn*, 151 Pa. Superior Ct. 459, 465, 30 A. 2d 235; Philadelphia Common Pleas Rule 270(b).

An examination of the trial judge's "Memorandum of Findings" indicates a finding of the following facts: (1) that Lewis acted for the Claughton interests as seller and for Pennroad and State Street as buyers; (2) that Bear Stearns took 50,000 shares for itself; (3) that the price of $13.75 per share, minus commission of $.1875 to the seller, and $13.75 plus the same commission to the buyers represented the market price at the time and reflected the size of the block of stock being sold; (4) that Lewis made full disclosure to Attorney Sadler, Mrs. Claughton's attorney, both of the fact that Bear Stearns was itself purchasing 50,000 shares and that it would receive double commissions; (5) that the price and the double commissions were specifically approved by the New York Stock Exchange. From these facts the trial judge concluded that the price "was an excellent price", that Lewis' version concerning the impartation of knowledge to Mrs. Claughton and her attorney was the "more accurate"; that Mrs. Claughton had failed to sustain her burden of

proof; that Bear Stearns was guilty of no fraud, actual or constructive, and that "the transaction [was] . . . clean and above board." In its "Opinion" the court noted that the trial judge's basic findings were that Bear Stearns "was faithful, loyal, truthful and scrupulous" and that not only did Lewis think that the price was fair but that Mrs. Claughton by her petition for approval of this sale to the Dade County Court indicated her approval; that on the direct issue of credibility between Lewis and Sadler concerning double commission, the trial judge who heard both witnesses, "believed Lewis, not only on the basis of his better recollection but of his superior credibility" and found that Mrs. Claughton had failed to sustain her burden of proof.

On this appeal the appellant has three complaints: (1) That Bear Stearns failed to sustain its burden of proof that the appellant had knowledge, active or constructive, of appellee's dual representation, the double commissions collected, etc., and had consented thereto; (2) by reason of the trial court's failure to rule on objections or to make specific findings of fact, the record in the court below is such as to render impossible a determination of the facts upon which the court based its general findings; (3) that the court erred in denying leave to the appellant to take depositions of certain witnesses during the trial.

If appellant is to recover it must be upon the theory that Bear Stearns, while acting as her agent, was under a duty to disclose to her the fact that it represented both the proposed buyers as well as herself, that it intended to and did receive commissions from the sale of the stock from both the buyers and herself and that Bear Stearns for its own account purchased a large number of the securities. Generally, an agent cannot represent two principals in the same transaction and if dual representation takes place the validity

of the transaction is subject to close scrutiny by the courts. "Mr. Justice STERRETT, speaking for the court, said in Rice v. Davis, 136 Pa. 439, 442, 'The principle, underlying this case that an agent for the sale of property cannot at the same time act as agent for the purchase thereof, or interest himself therein, and thus entitle himself to compensation from both vendor and vendee, is grounded on the infallible declaration that "no man can serve two masters." As a rule of public policy, it is distinctly recognized in our text-books on agency, and in numerous adjudicated cases . . . . It forbids that any one intrusted with the interests of others shall in any manner make the business an object of personal interest to himself, because, from a frailty of nature, one who has the power will be too readily seized with the inclination to use the opportunity for serving his own interests at the expense of his principal . . . . It matters not that no fraud was meditated, and no injury done. The rule is not intended to be remedial of actual wrong, but preventative of the possibility of it' ": *Haines v. Biddle et al.*, 325 Pa. 441, 443, 188 A. 843. See also: *Cannell v. Smith*, 142 Pa. 25, 31, 21 A. 793; Restatement, Agency 2d, §389, §391.

In *Warner Company v. MacMullen*, 381 Pa. 22, 27, supra, we recognized that: "The rule that an agent cannot act for both parties to a transaction has no application where such double representation was known to the parties and not objected to by them at or previous to the time when they executed their agreement: [citing cases]." See also: Restatement, Agency 2d, §390, §392.[8]

---

[8] §392, comment b, Restatement of the Law, Agency 2d, p. 215. states: "One employed as agent violates no duty to the principal by acting for another party to the transaction if he makes a full disclosure of all relevant facts which he knows or should know,

The thrust of appellant's argument in this respect is stated in her brief: "There is *no credible evidence* on the record that prior to July 6, 1955 any disclosure was made directly to Plaintiff Mrs. Claughton that Defendant was also acting as agent for the purchasers who had agreed to compensate Defendant for so doing. There is no *evidence whatever* that Plaintiff Mrs. Claughton ever either consented to Defendant's double agency and double commissions or had knowledge thereof. The *evidence establishes* that the Plaintiff Mrs. Claughton had no knowledge that Defendant was to be among the purchasers until the evening of June 27, after State Street, Pennroad and Bear Stearns had agreed to purchase." (Emphasis supplied).

Our independent examination of the record indicates that the findings of fact and conclusions of the trial judge are based upon evidence both adequate and sufficient. In making such an examination we were mindful that the contacts made by Lewis on behalf of Bear Stearns were made either directly with Mrs. Claughton, the principal, or with Attorney Sadler, her counsel. Under the circumstances herein portrayed we are satisfied that the authority of Attorney Sadler to act in this transaction was such that notification to him was notice to Mrs. Claughton (Restatement, Agency 2d, §268) and that any knowledge on the part of Attorney Sadler concerning this transaction was such that it was his duty to transmit such knowledge to Mrs. Claughton (Restatement, Agency 2d, §272). It is evident that knowledge was brought both to the principal and her agent to the effect that Lewis was

---

or if the principal otherwise knows of them and acquiesces in the agent's conduct . . . . The agent's disclosure must include not only the fact that he is acting on behalf of the other party, but also all facts which are relevant in enabling the principal to make an intelligent determination . . . ."

representing both Mrs. Claughton and the purchasers, that Bear Stearns was receiving double commissions and was itself participating with Pennroad and State Street in the purchase of this block of securities. To detail at length the evidence in this respect could serve no useful purpose; it is evident the record fully justifies the result reached in the court below.

Appellant next argues that the trial judge by failing to make specific findings of fact and conclusions of law and by failing to rule upon objections and motions left the record in a state of confusion. In the course of this opinion we have had occasion to note that, under Rule 270 of the Courts of Common Pleas of Philadelphia County, "(b) The decision of the trial judge may consist only of his decision of the case, but he may include also such other matters as he deems desirable". Such rule relieves a trial judge in Philadelphia County from making specific findings of fact and conclusions of law. However, an examination of both opinions in the court below indicates that certain findings of fact and conclusions of law were made, albeit in general terms; a failure to enumerate specifically such findings of fact and conclusions of law does not detract from the fact of their presence in the court's opinions as a reading thereof will readily indicate. The opinions of the court below reveal that all the relevant and competent evidence was thoroughly taken into consideration by the court. The technical argument now advanced cannot prevail in the face of a record which indicates that appellant's case was fairly and thoroughly tried.

Appellant's final argument is that during the course of the trial the court below refused to grant her the right to take the depositions of certain officials and employees of Pennroad and State Street. The court below in its opinion has fully and adequately

disposed of this complaint. "One [complaint] is that she was denied discovery procedure. At first she sought leave to take the oral depositions of Pennroad and State Street officials [Pennroad and State Street were not parties to this litigation] as under cross-examination. This novel request was denied, and plaintiff asked to take their oral depositions directly. Upon assurance from defendant's counsel that the witnesses would be available and would co-operate, the Court denied the request but gave plaintiff leave to file interrogatories. This was not done. Plaintiff had already filed interrogatories, some sixty-nine of them, and examined many records of defendant and other witnesses. Plaintiff did not demur to the Court's action but came to trial without asking for a continuance. It was only after she had put on her whole case that her counsel asked for a recess to have discovery by oral depositions.

"This is moot because the Pennroad and State Street personnel appeared and testified for defendant after plaintiff had been told that they were in Court and was given the chance to call them as her witnesses. This incident was a fishing expedition and no legal harm was done [to] plaintiff by not allowing it."

All pertinent and competent evidence was fully and completely considered and the cause fairly tried in the court below; the result reached was based on adequate and sufficient evidence.

Judgment affirmed.

Mr. Justice Bok and Mr. Justice McBride took no part in the consideration or decision of this case.

---

Dissenting Opinion by Mr. Justice Bell:

I agree with the authorities and the principles of law stated in the majority opinion, but not with their application to some of the facts in this case.

All the parties agree that defendant was employed as plaintiff's agent to sell 525,000 shares of stock and as such was duty bound to sell her shares of stock at the highest price obtainable. Defendant acted throughout the entire transaction as plaintiff's agent, except as to 50,000 shares which it purchased as principal; but even as to these shares defendant claimed a commission as her agent.

For approximately 2,000 years the civilized world has believed the ancient moral precept that man cannot with fidelity serve two masters when their interests are conflicting. This moral principle has become embedded in the law. In this case defendant attempted to serve two masters—the seller and the purchasers of 475,000 shares—and also itself (in the capacity of both agent and principal), and to take for itself an agent's commission from the seller on 525,000 shares of stock (including a commission on 50,000 shares which it purchased as principal), and still another commission from the purchasers of 475,000 shares. The majority agree that this can be lawfully done only if defendant proved such an arrangement by the clearest possible evidence, and the entire transaction was clearly explained to and agreed to by plaintiff. Obviously, the best evidence was not a telephone conversation between defendant's representative and plaintiff's lawyer which preceded the written contract and produced oath against oath—the best evidence was the telephoned telegram sent by Bear Stearns & Company, and especially the subsequent written contract entered into between plaintiff and Bear Stearns & Company.

The seller was an inexperienced woman who was in a critical financial condition. On June 28th she and Bear Stearns signed a written agreement of sale for 525,000 shares "for the price of $13.75 per share less $18.75 per 100 shares, less Federal and State transfer taxes, . . . ." Defendant admits that plaintiff accepted

this offer reluctantly because she felt the price was too low and because defendant agreed to use its best efforts (which, so far as the record shows, it made no attempt to do) to secure a higher price for the stock. The contract, we repeat, was dated June 28th, and settlement was made July 5th. On August 12th the stock sold on the New York Stock Exchange at 21⅝ per share.

The telephoned telegram (June 28, 1955) was sent to plaintiff's attorney and reads: "This confirms offer to purchase 525,000 shares of Missouri Kansas Texas common stock by a group of which Bear Stearns & Co. is a member at a price which is the equivalent of 13 3/4 less $18.75 per hundred shares less tax. (Signed) Bear Stearns & Co." If this telegram can be said to clearly disclose that Bear Stearns was acting as principal *and also as plaintiff's agent* in the sale of this stock, it is clear as crystal that nothing is said as to its also receiving a commission from the purchasers of 475,000 shares.

The written agreement between plaintiff and defendant dated June 28, 1955 is very short and pertinently provides:

"Whereas, the purchaser representing a group of investors of which it is a member is desirous of purchasing said 525,000 shares of the common stock aforedescribed, subject to the terms and conditions hereinafter set forth:

. . .

"(1) The Seller hereby agrees to sell and deliver to the Purchaser stock certificates evidencing said sale, 525,000 shares of the common stock of Missouri-Kansas-Texas Railroad Company for the price of $13.75 per share less $18.75 per hundred shares, less Federal and State transfer taxes, said purchase price to be paid in cash at the time of delivery of said stock certificates."

If this contract can be construed to *clearly* prove that Bear Stearns was acting not only as plaintiff's agent but also as the purchaser of 50,000 shares, it is certainly clear that the contract does not reveal that Bear Stearns would receive an additional commission from the purchasers of 475,000 shares.

To summarize: In my judgment, there is nothing in the telephoned telegram, or in the written contract which clearly and sufficiently disclosed to plaintiff that Bear Stearns & Company was not only charging plaintiff as her agent a commission on 525,000 shares (including a brokerage commission on 50,000 shares, which, we repeat, it purchased from her as principal) but was also charging the purchasers a brokerage commission on 475,000 shares. In other words defendant did not reveal its dual conflicting position.

Mr. Felix, plaintiff's counsel, has aptly expressed my feelings on this transaction in his letter of July 22nd, the relevant portions of which are as follows:

"Dear Mr. Lewis: [Bear Stearns & Company]

"Two facts, which were not disclosed prior to Monday night, June 27, when you telephoned that you had sold the above-mentioned stock, have caused Mrs. Claughton and ourselves a great deal of concern. Up until after the time the offer, made through you *as her agent,** had been accepted, she believed, as she had every right to believe, that you were representing her *at the bargaining table solely and exclusively as her agent and with the 'singular loyalty' which that fiduciary relationship implies*. And it was because of that relationship and the confidence she placed in your integrity and judgment that, in a telephone conversation with you on Friday, June 24, she, at your insistence, reluctantly agreed to a firm offer of the estate's

---

* Italics throughout, ours.

stock at $13.75 per share until Midnight, Monday, June 27.

"You will recall, however, that in that conversation she stated that she thought this block of stock, because of its control feature, was worth considerably more and only acceded to the $13.75 price you urged upon the condition that you would exert every effort to get a higher price. . . .

"When you recall these circumstances and keep in mind the implicit trust she placed in you, you can readily understand what a shock it was when, at the time you telephoned that the sale had been made, you disclosed, *for the first time,* that you were buying 50,-000 shares of the stock yourself. Also, what a second shock it was when she learned *for the first time on July 6 and after the stock had been transferred,* that you were being paid a commission by the other purchasers. She reasons that a commission implies a service, and wonders how, in good conscience, you could sit on 'both sides of the bargaining table' and properly serve two masters. In other words, she seriously questions whether the price of $13.75 was negotiated and fixed in the arms-length manner which your agency, as well as your statements and advice to her, led her to believe that it was."

Under the above mentioned facts, I believe that Bear Stearns and Company is not entitled to any commissions from plaintiff.

Mr. Chief Justice JONES joins in this dissent.