## Hartigan *v.* Clark, Appellant.

Argued September 27, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Hamilton A. Robinson,* with him *Dickie, McCamey, Chilcote & Robinson,* for appellants.

*Harry Alan Sherman,* for appellee.

*Lisle A. Zehner,* for David B. Roberts, Prothonotary, Court of Common Pleas of Allegheny County, appellee.

OPINION BY MR. JUSTICE BOK, December 1, 1960:

This case has been tried twice and was here on appeal from the grant of a new trial after the first one, at 389 Pa. 283 (1957), 133 A. 2d 181. Both trials resulted in a verdict for the plaintiff in the sum of $20,-000, and this time the verdict was allowed to stand. Defendant appealed when her motions for a new trial and for judgment n.o.v. were overruled.

There is a preliminary matter to cope with before we test the merits. Defendant filed, on December 9, 1959, a motion to amend the record to show that the verdict fee was paid and judgment entered on November 20, 1959, instead of on August 5, 1959. Since this appeal was taken on February 17, 1960, the timeliness of its filing depends on whether judgment was entered on one date or the other. The court below, in an opinion by the late Judge MARSHALL, of Allegheny County, held a hearing, took testimony on the petition, upheld the date of August 5th, and dismissed defendant's petition to amend the record. The current appeal is also from that order.

Certain facts are conceded: that the court below overruled defendant's motions for a new trial and for judgment n.o.v. on August 4, 1959; that the jury fee of $5 was paid on August 5; that a receipt bearing that date has a legend on the reverse side: "Verdict fee paid and judgment entered on verdict, etc."; that on the same date judgment was entered in the Judgment Docket and indexed in the current General Judgment Index, as well as in the Ad Sectam Judgment Docket; and that the judgment was published in the August 7 issue of the Pittsburgh Legal Journal.

It is also admitted that the Appearance Docket contains the following entry: "On August 5, 1959, verdict fee paid and judgment entered on verdict in favor of William Hartigan in sum of $20000."

The contention of defendant is that this entry was actually made on November 20th and retro-dated. This forms the battle lines, since the plaintiff stands on the record as it appears.

The opinion of Judge MARSHALL contains the following two paragraphs in disposition of this controversy: "After a careful review of the entire record, the Court is of the opinion that there is not sufficient evidence to support defendant's contention. It is admitted that counsel for plaintiff paid the verdict fee on August 5, 1959, and judgment was noted on the verdict slip, in the fee docket, the Adsectum Index and General Judgment Index. The clerk from the Prothonotary's Office testified that he entered the judgment on the back of the verdict slip on August 5, 1959, and also on the Appearance Docket. The court records speak for themselves and the Court should sustain them unless there is sufficient evidence to the contrary.

"In addition to this, it is to be noted that although counsel for defendant states he had the Appearance Docket checked periodically, he never examined the other dockets or the papers themselves until November 20, 1959. Had he done so, he would have discovered that plaintiff's counsel paid the verdict fee on August 5, 1959, and judgment had been entered in the other dockets."

The evidence before the court on the crucial point was the testimony of five men: Norbert Pail, a college student working part time in the winter and full time in the summer in the office of defendant's counsel; David H. Trushel, Esquire, a lawyer associated with defendant's counsel; Harry A. Sherman, Esquire, plaintiff's trial counsel; Hamilton A. Robinson, Esquire, defendant's trial counsel; and John S. Kenna, a clerk in the Prothonotary's office.

Pail testified that he was directed by Mr. Robinson to inspect the Appearance Docket in early August; that he did so on August 10 and 27, September 4 and 10, October 17, 18, 19, 26 and 29, and November 5, 9, 12 and 16; that on none of these dates did he find the record of a judgment on the Appearance Docket; that he was unfamiliar with the other judgment indices and did not check them; and that he made—improperly, though he did not consider it so—a small pencilled X on one page of the Appearance Docket in order to show his place and relieve him from rereading the record prior to that point.

Mr. Trushel testified that he was an associate in Mr. Robinson's office and was asked by him to examine the Appearance Docket on November 20; that he did so on that date and found no entry of the judgment; that he then got the papers in the case and found the receipt for the jury fee and its reference to entering judgment; that he spoke to Mr. Mawhinney, a floor man in the Prothonotary's office, who looked at the Appearance Docket and pronounced it an error; that Mawhinney then summoned Kenna, another floor man, who, at Mawhinney's direction, entered judgment in the Appearance Docket as of August 5, 1959; that this was done in his, Trushel's presence on November 20; that he saw Pail's pencilled X on the docket; and that when he protested Kenna's *nunc pro tunc* entry of judgment on the ground that it would affect the right to appeal, Kenna shrugged his shoulders.

Mr. Sherman testified that he paid the $5 verdict fee to the Prothonotary on August 5, 1959; that he notified Mr. Robinson orally that he had paid the verdict fee and taken judgment; and that he never checked the Appearance Docket after August 4th.

Mr. Robinson testified that he directed Pail to check the Appearance Docket; that Pail reported to

him regularly; that he did not know about judgment being taken until he met an associate of Mr. Sherman's who said that it had been done and that he had a receipt, and that he then had the situation checked; that Mr. Sherman did not tell him that judgment had been taken; that he had no notice that it had been; and that he had never taken judgment for his opponent in order to preserve his right to appeal.

Kenna testified that he was a prothonotary's clerk; that he believed that he had made the entry of judgment in the Appearance Docket on August 5 because the book said so, but that he had no independent personal recollection of the fact, although he did remember Mawhinney's speaking to him about it; and that he had seen the small pencilled X in the Docket but did not know what it meant.

On the basis of this testimony Judge MARSHALL said that the records spoke for themselves and should be sustained except on sufficient evidence to the contrary: he referred to the admitted facts but dismissed defendant's contention concerning the disputed Appearance Docket by saying that it was not supported by sufficient evidence.

We find it difficult to imagine more specific evidence than that of Messrs. Thrushel, Robinson and Pail. Thrushel saw Kenna make the entry on November 20; Kenna didn't remember but relied on the book. Plaintiff argues that if defendant didn't call Mawhinney to testify it must be presumed that the witness had adverse evidence to offer, but in a case like this that sword cuts both ways; the court was entitled to every scrap of relevant testimony and the duty to call a witness, if he had any knowledge, lay equally on both sides.

This is not the case where we feel bound by a chancellor's findings of fact. These are not lay witnesses, strangers to the court's process. The essential issue

lies between an officer of the court and an employe of one of its arms. Counsel's unworthy imputation of unprofessional conduct to a brother lawyer, that he would shade his testimony so as to uphold the position of his firm, is weaker than the counter inference that the Prothonotary's employe may have gone by the book and forgotten the fact in order to cover his reprehensible act of retro-dating an entry of judgment and destroying counsel's right of appeal.

We regard the evidence favoring November 20 as so clear and weighty and the opposing evidence as so lacking in substance that we would be regrinding the miller's grain if we ordered a further hearing or failed to settle the issue ourselves. The finding is so clearly in error that it amounts to an abuse of discretion and is subject to being overruled: *Claughton v. Bear Stearns & Co.*, 397 Pa. 480 (1959), 156 A. 2d 314.

The court below accepted Kenna's testimony that he made the entry in the Appearance Docket on August 5th, when Kenna had no independent recollection and no other reason than that the book contained the date. But that was the very thing to be proved. To discredit the countervailing evidence as insufficient, when it consisted of three persons, two of them lawyers and one of those an eyewitness, amounts to a capricious disbelief which in itself warrants our setting aside the findings: *Masciantonio Will*, 392 Pa. 362 (1958), 141 A. 2d 362.

The Act of June 11, 1879, P. L. 134, 17 PS §1929 provides that a final judgment must be entered in the appearance docket.

In *Trestrail v. Johnson*, 297 Pa. 49 (1929), 146 A. 150, we said: "Not alone the Act of 1879, but the earlier Act of April 3, 1843, P. L. 127, recognizes that judgments must be 'properly entered upon the appearance docket' before they are 'transcribed' in the judgment docket or index."

Both Acts apply in terms to all counties in the State, and we see nothing inconsistent with them in the Second Class County Act of May 16, 1935, P. L. 168, §1, 17 PS §§1933 and 1934 (pocket). Our problem concerns the timing of an appeal, for which the Appearance Docket is appropriate, and does not concern title to real estate.

In *McClelland v. West Penn Appliance Co.*, 132 Pa. Superior Ct. 471 (1938), 1 A. 2d 491, the Court said, speaking of the Non Obstante Veredicto Act of 1905: "The Act of March 29, 1805, 4 Sm. L. 242, §13 (12 PS §1051), providing for the payment of a jury fee, and the entry of judgment upon a verdict, had no reference to a judgment entered directly by the court under the Act of 1905: Jones v. Marion Coal Co., 227 Pa. 509, 76 A. 248. Such judgment must be first entered in the appearance docket provided for in the third section of the Act of June 11, 1879, P. L. 134 (17 PS §1929). This entry alone makes it a valid judgment: Trestrail v. Johnson, 297 Pa. 49, 56, 57, 146 A. 150. . . .

"Where the court directs a judgment to be entered, intending that the prothonotary should enter the final judgment, there is not a final judgment until such judgment is actually entered in the appearance docket: Watkins v. Neff, supra. [287 Pa. 202]."

Both of the cited cases involve the timing of an appeal.

We are therefore of opinion that there could be no final judgment until it was entered in the Appearance Docket, and that the case was not appealable until then: *American Trust Co. v. Kaufman,* 279 Pa. 230 (1924), 123 A. 785; *Stadler v. Mt. Oliver Borough,* 373 Pa. 316 (1953), 95 A. 2d 776. We believe that the date of entry of August 5, 1959, has no competent evidence to support it and that the date of November 20 is clearly established.

The order of the court below is reversed; the defendant's petition to amend the record by changing the entry of judgment in the Appearance Docket from August 5, 1959 to November 20, 1959 is granted; and the record is remanded for that purpose.

The appeal was therefore timely.

Turning to the merits, we have a refusal of judgment n.o.v. and hence should regard the testimony in the light most favorable to the verdict, with all reasonable inferences resolved accordingly: *Muroski v. Hnath,* 392 Pa. 233 (1958), 139 A. 2d 902.

Plaintiff fell down the steps in the McKeesporter Hotel in Allegheny County, and suffered severe injuries. The steps, at the end of a corridor, led down to a bar and grille and washrooms on the floor below. They had two landings, left turning.

Plaintiff wanted to wash up and eat. From the top of the stairs he stepped down onto the first step below floor level with his right foot and to the second step with his left foot, but when he tried to move his right foot in order to put it on the third step it "hung up . . . right at the toe of the shoe. . . . I caught it under the right step." There was a handrail on the right wall but none to the left, near which plaintiff was in the act of descending. He fell, heard a bang, was dizzily aware of being in the hospital, and woke up eventually at home.

He said that he was looking where he was going and saw nothing wrong with the steps. There was evidence that in the inadequate lighting the condition of the step could not be seen from above. There was no visible light bulb within the stairwell, but some light was diffused downwards on the stairs from a light 15 to 18 feet above in the ceiling of the corridor and also indirectly upwards from the grille. Hence the lighting was "dim and kind of dark", not pitch dark but with "some light".

Plaintiff had been in the hotel only once before, eight or nine months prior to his accident, and he remembered nothing of its condition then. No other witness testified to the condition of the steps before or at the time of the accident. Aside from catching the toe of his shoe, plaintiff knew nothing about it.

The only evidence describing what it was that may have thrown him was the testimony of his daughter and son-in-law, who visited the hotel twenty-four hours after the accident and examined the steps. They testified that the metal strip, or nosing, which covers the outer end of each step, was, on the first step below floor level, raised or "turned up" a half to three-quarters of an inch above the step for a distance of 12 to 18 inches out from the left-hand wall going down. These nosings were "old, beat up, dirty, dented", and the one in question was "jaggy . . . it was broken and it was jagged like a refrigerator or something was pulled over the top of it."

Had the plaintiff or some other witness seen such condition just after he fell, the case could properly have gone to the jury: see *Stais v. Sears-Roebuck & Co.*, 174 Pa. Superior Ct. 498 (1954), 102 A. 2d 204, in which a woman fell down steps in a store and while she sat on them saw the lifted nosing and missing screws. The Superior Court said: "What will amount to constructive notice of a defect or dangerous condition existing upon a defendant's premises necessarily varies under the conditions of each case. Among the factors affecting the question are the number of persons using the premises, the frequency of such use, the nature of the defect, its location on the premises, its probable cause, and the opportunity which defendant, as a reasonably prudent person, had to remedy it: Bremer v. W. W. Smith, 126 Pa. Superior Ct. 408, 191 A. 395. It is not always necessary for plaintiff to produce positive testimony as to how long the defect

existed. In Oberheim v. Pennsylvania Sports and Enterprises, Inc., 358 Pa. 62, 55 A. 2d 766, Mr. Justice JONES points out that direct proof of defendant's knowledge is not essential to the imposition of liability where the condition was a likely and foreseeable result of the manner in which the premises were being maintained and used."

See also *Oberheim v. Pennsylvania Sports and Enterprises*, 358 Pa. 62 (1947), 55 A. 2d 766; *Coxey v. Guala*, 112 Pa. Superior Ct. 460 (1934), 171 A. 484; *Cutler v. Dushoff*, 192 Pa. Superior Ct. 37 (1960), 159 A. 2d 524.

The basic law is clear. In *Dushoff*, where a patron in a restaurant fell because her heel caught in a loose piece of metal stripping, the Superior Court said: "As restaurant club owners inviting the public to do business on their premises defendants owed plaintiff the affirmative duty to maintain his premises in a reasonably safe condition for the contemplated use thereof. They are subject to liability for bodily injuries suffered by business visitors on their premises if they knew, or by the exercise of reasonable care would determine the existence of a condition which they realize involves an unreasonable risk to the visitors. There being no proof of actual knowledge of the existence of the dangerous condition on the part of defendants here, the burden is on the plaintiff to show the defect had existed for a sufficient time to charge defendants with constructive notice."

In *Angelelli v. A. J. Mansmann Co.*, 168 Pa. Superior Ct. 275 (1951), 77 A. 2d 678, a woman fell over stair stripping in a store. No one testified to the condition of the stairs then, but plaintiff's husband went to the store and inspected them three or four days after the accident, and plaintiff went back about a month later. Recovery was denied, the Court saying: "Before she can plead constructive notice to defend-

ant, plaintiff must establish the premise on which it is founded: that there was a defective condition on the stairs which caused her to sustain injuries. Plaintiff herself did not examine the steps until about a month after the accident, and her husband inspected them three or four days after the accident. Accepting her version as to the condition of the stairs a month later—that they were 'squeeky' and the stripping loose —as true in every detail, it does not follow that such condition existed on the day of the accident and caused her fall.

"The mere happening of an accident does not charge a defendant with liability; res ipsa loquitur has no application. It was for plaintiff to prove some specific default or, at least, an inference of negligence as an indispensable basis of recovery. Chapman v. Clothier, 274 Pa. 394, 118 A. 356; Reay v. Montgomery-Ward & Co., Inc., 154 Pa. Superior Ct. 119, 35 A. 2d 558; Markman v. Fred P. Bell Stores Co., 285 Pa. 378, 132 A. 178."

This is not the case, like *Kimble v. Mackintosh Hemphill Co.*, 359 Pa. 461 (1948), 59 A. 2d 68, where a roof fell on the plaintiff and he was allowed recovery because he could show a basic defect—rotted timbers— which in itself was evidence that the weakness was of long standing and should have been known by the defendant. The instant case presents no such evidence, and we are left with the description of a condition twenty-four hours after the accident which may or may not have existed when plaintiff fell. Just because the nosings, or even the steps, were old and dirty and dented doesn't mean that they were also out of place or, if they were, that they had been so during their aging period or during any definite period of time. Many old, dirty, and dented things are still strong and tough. The jagged and broken condition of the nosing may indeed have been caused, as plaintiff's witness

suggested, by a refrigerator being dragged across it, perhaps during the twenty-four hours following the accident.

This leaves the case within the rule that the mere happening of an accident does not raise an inference of negligence, and to allow recovery would change the law by making applicable the doctrine of res ipsa loquitur or exclusive control in an area where they do not belong: *Smith v. Bell Telephone Co.*, 397 Pa. 134 (1959), 153 A. 2d 477; *Schofield v. King*, 388 Pa. 132 (1957), 130 A. 2d 93.

Hence the plaintiff has failed to carry his burden of proof. We may not let the jury guess.

Judgment is reversed, with directions that judgment be entered for the defendant n.o.v.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The decision of the Majority in this case, which has now been before this Court twice, is that kind of a decision which from time to time shakes the faith of litigants in the reliability of the courts. The cause for disillusionment is not that the plaintiff has been deprived of a verdict awarded him by the jury. It is that this Court allowed him to believe for three years that he had a compensable action and then, in the end, entered against him a fatal judgment which it could have announced in 1957 when the case was on appeal the first time.

Briefly the history of the litigation is as follows. On the evening of April 9, 1952, the plaintiff, William Hartigan, 60 years of age at the time, entered the McKeesporter Hotel in McKeesport as a patron. In order to reach the basement of the hotel, for which he was headed, he started down a stairway, the treads of which were covered with linoleum and edged with tight metal stripping. The illumination over the stairway was dim and unrevealing. His right foot caught

against metal edging on the first step, he lost his balance and plunged to the bottom of the stairway, sustaining serious injuries. The lower Court, in describing those injuries, said the plaintiff "was rendered unconscious by the fall, in which he sustained a fracture of the right orbit of the skull, optic atrophy, and blindness, as well as multiple injuries, including a comminuted impacted fracture of the right radius of the wrist."

On the day following the accident, the plaintiff's daughter and her husband, examined the scene of the accident. They found that the edging on the top step was turned up about three-fourth of an inch and that it was "dirty, old and dented." They found also that the "dim light coming from the ceiling which was about 22 feet high," was of such a character that the defect in the step could not be seen by anyone descending the stairway.

Hartigan brought suit against John P. Hoerr, individually and trading as the McKeesporter Hotel. John P. Hoerr has since died and the present defendant is Alyce Hoerr Clark, Administratrix of the Estate of John P. Hoerr, deceased, and Alyce Hoerr Clark, individually. In due time the case came to trial and the jury returned a verdict for Hartigan in the sum of $20,000. The defendant moved for judgment n.o.v., and a new trial.

The trial court granted a new trial on the basis that the verdict was against the weight of the evidence. Hartigan appealed to this Court which affirmed the grant of the new trial (389 Pa. 283). The case then went back for a second trial and the jury again rendered a verdict for Hartigan in the sum of $20,000. This time the defendant appealed, and a majority of this Court has now entered judgment for the defendant, notwithstanding the verdict.

If this Court is of the opinion that the plaintiff Hartigan was not entitled to a verdict on the facts averred and proved, why didn't it say so at the time of the first appeal? Why did it subject the plaintiff to the expenditure of time and expense and to the suspense and ordeal of a second trial when it could have told him the first time that his aspirations were but fragile bubbles on the sea of a meaningless hope, that his anticipations were but sterile buds on the bleak tree of unrealizable yearning, and that, no matter what his efforts, he was in the end to wind up in the inextricable swamp of a judgment n.o.v.?

Why didn't this Court direct the plaintiff to cease his efforts and abandon his endeavors because he couldn't prove his case of negligence since, as the Majority now says, he could not establish that the owner of the hotel in which he was injured had had notice of the defect which brought him to grief?

This Court knew the first time the case was before it the nature of the evidence on the subject of notice. If the evidence was not sufficient to establish notice, why didn't this Court so declare? At the first trial, the lower court, in charging the jury on constructive notice said: "If you find from the description of this step by Mrs. Link that the metal part actually was turned up for half an inch or so right after this fall, then you can consider whether that condition which would permit a person's foot to catch the metal strip *existed there long enough before that the defendants, in the exercise of reasonable care, should have discovered it,* if the strip was loose and if the edge of the strip extended above the linoleum, if it created a dangerous risk to one who might step down those steps, and *if that existed there long enough that the defendant should, in the exercise of reasonable care, have discovered it, and if they did not discover it or if they did discover it and didn't exercise reasonable care to*

*make the condition safe,* then you could find that the defendant in this case was negligent, and if you believe the testimony of the plaintiff and his witnesses that it was that condition which caused his fall, then it would be proper in this case to bring in a verdict for him provided the plaintiff himself was not guilty of contributory negligence."*

The jury found, after these instructions, that the negligent condition described had existed for a sufficient period of time to constitute constructive notice to the defendant. This Court reviewed the evidence on the first appeal here and was familiar with what had been presented on constructive notice. It read what the trial court said about constructive notice. Why didn't it then say that the evidence presented was not enough to prove constructive notice? Why did it let the case go back for a second trial and now, with three years having passed since that first decision, declare that the plaintiff failed to prove constructive notice?

I contest that the plaintiff failed to prove the constructive notice required by law, and so indicated in my Dissenting Opinion at the time of this Court's first decision. But whatever the evidence was on this subject at the first trial, it was written large in the record for this Court to see.

In its first decision this Court announced only that the verdict was against the weight of the evidence and ordered a new trial on that ground alone. It allowed the plaintiff to believe that there was no specific question about lack of notice, and now, that he has suffered through all the worries and expense of a second trial, he is informed that he did not have a case to begin with.

---

* Italics throughout mine.

Is this fair? Is it right for an appellate court to offer a hope to a litigant which it knows cannot be realized? Is it just for a supreme tribunal to assure a litigant of the structural soundness of his case when it knows of a fatal defect in its foundation? My answer, of course, is in the negative and I add that the decision of an appellate court which cannot be justified in the temple of conscience will carry little weight in the minds of men as law worthy of respect.

This Court is playing at ducks and drakes with this case all the way around. In its first decision it declared that it would uphold the order of the lower court. In this present decision it announces that it will not uphold the decision of the lower court—even though the facts have always been the same.

In affirming the lower court which had ordered a new trial at the end of the first trial, this Court said: " 'One who appeals from the grant of a new trial assumes a very heavy burden indeed. Before we will reverse, the appellant must be able to show that the trial court was guilty of a palpable abuse of discretion or acted on an erroneous rule of law which, in the circumstances, controlled the outcome of the case and is certified by the trial court as the sole reason for the granting of a new trial.' " (389 Pa. 283).

Now, on this second appeal, this Court, takes a different attitude toward the court below. At the end of the second trial the defendant filed motions for judgment n.o.v. and a new trial. The trial judge, after having heard and seen the witnesses, found that the verdict was justified under the law and the facts. The court en banc, after listening to arguments and reading the record, declared that the verdict was in accordance with the facts and the law, and should stand. The defendant appealed to this Court, and this Court now says that the verdict should not stand.

This Court now abandons the confidence it displayed in the lower court three years ago. Why?

Is a trial court to be less supported if it refuses a new trial and judgment n.o.v. than if it grants a new trial? If so, where is the rationalization behind such reasoning?

This Court, in its present decision, has made an issue of constructive notice, but constructive · notice was an issue for the jury in both trials. In the second trial the trial judge, who was the veteran jurist, Judge MONTGOMERY, now a judge of the Superior Court, charged the jury at length on the subject of constructive notice. In that charge, he called the jury's attention to the subject of constructive notice four or five times.

It would lengthen this Dissenting Opinion unduly to repeat all that Judge MONTGOMERY said to the jury on constructive notice, but what he said is spread on the record so that judges, lawyers and students who are interested in learning on what basis the jury found that the defendant did indeed have constructive notice of the defective tread in the stairway, may have their interest and curiosity satisfied by looking at that record. Such study will also reveal how completely satisfied Judge MONTGOMERY was, after a post-trial review, that the defendant did have constructive notice. In refusing the defendant's motion for judgment n.o.v. and a new trial, Judge MONTGOMERY said: "Defendant [who is administratrix of the estate of the deceased original owner] contends that she is entitled to a judgment n.o.v. *on the basis that neither she nor her deceased husband had any notice of the defective condition,* if it existed at the time; and in the alternative, that a new trial must be granted because of the court's refusal to admit plaintiff's record of intemperance. Our Supreme Court has recently stated: . . . 'Where the testimony offered by the plaintiff makes out a

prima facie case showing the existence of facts from which an inference of negligence arises, the case is necessarily for the jury, notwithstanding that the great preponderance of the testimony is with the defendant. . . .' *We feel that the plaintiff has made out a prima facie case, for his testimony reveals that the metal nosing on the first step was old, curled up, worn and dirty.* Defendant's premises were open to the public and constantly used by them. Unquestionably plaintiff's status was that of a business visitor, and as such, defendant had an affirmative duty to keep his premises in a safe condition."

Thus, it will be seen that Judge MONTGOMERY, supported by a court en banc, declared in positive language that the plaintiff's verdict should not be disturbed. But this Court rejects the court en banc's conclusions. Why? The facts are the same, the law is the same, the issues are the same as those involved in the first trial.

Judge MONTGOMERY said: *"The jury in the instant case obviously felt that defendant should have discovered the defective metal stripping,* and it is not within the province of this court to reverse its findings."

Why doesn't this Court support the court of common pleas in this definitive, substantive finding? Especially when it supported the common pleas court so formidably three years ago? What has happened to stare decisis? To consistency in the law? To regularity of procedure? Why is the law, on the same identical facts, interpreted in one manner in 1957 and in a diametrically opposite fashion in 1960?

The Majority Opinion says that in considering a motion for judgment n.o.v., the testimony should be read "in the light most favorable to the verdict, with all reasonable inferences resolved accordingly." It pays obeisance to this familiar rule in words but ignores it in action because, in reaching its decision, it re-

solves all reasonable inferences *against* the verdict winner.

The Majority Opinion describes the locale of the accident: "There was evidence that in the inadequate lighting the condition of the step could not be seen from above. There was no visible light bulb within the stairwell, but some light was diffused downwards on the stairs from a light 15 to 18 feet above in the ceiling of the corridor and also indirectly upwards from the grille. Hence the lighting was 'dim and kind of dark', not pitch dark but with 'some light.' "

Why wouldn't this condition of itself make out a case for the jury on the question of negligence? Inadequate lighting at a point of potential danger has always been regarded as culpable negligence in trespass cases. In *Stevenson v. Pa. Sports & Enterprises, Inc.,* 372 Pa. 157, 161, this Court said: ". . . It is negligence to fail to provide an area where there is a great difference in levels with adequate light so that a person who is properly in the area is warned."

In *Hall v. Glick,* 177 Pa. Superior Ct. 546, 548, the Superior Court said: "Plaintiff was lawfully on the premises as a business invitee. As such, she was owed by defendant who was in control of a common stairway, the duty of maintaining the premises in a reasonably safe condition and the duty to warn her of any dangerous condition of which he was aware. . . Plaintiff's testimony establishes that she was injured because a narrow, turning staircase was inadequately lighted. *Inadequate lighting of stairs has been held to create a dangerous condition sufficient to constitute negligence.*"

The Majority Opinion in the case at bar says: "The only evidence describing what it was that may have thrown him [the plaintiff] was the testimony of his daughter and son-in-law, who visited the hotel twenty-four hours after the accident and examined the steps.

They testified that the metal strip, or nosing, which covers the outer end of each step, was, on the first step below floor level, raised or 'turned up' a half to three-quarters of an inch above the step for a distance of 12 to 18 inches out from the left-hand wall going down. These nosings were 'old, beat up, dirty, dented', and the one in question was 'jaggy . . . it was broken, and it was jagged like a refrigerator or something was pulled over the top of it.' "

The fact that the metal strip was "old, beat up, dirty, dented" would of itself be enough to raise the inference that the defect was not of recent origin. The adjective "old", except in the life of a butterfly or insects that live but a day, is bound to indicate a period of time embracing at least days, if not weeks and months. Considering that we are dealing with a hotel in a fairly large city (52,000 pop.) the duty unquestionably devolved upon the owner to make inspection of the steps at least once a day, if not more frequently.*

The jury certainly had the right to infer that a piece of metal which is old, bent and dirty represents a condition which existed for at least several days before the plaintiff tripped over it.

The Majority Opinion says that "Had the plaintiff or some other witness seen such condition just after he fell, the case could properly have gone to the jury." There is no case where someone may not suggest how the evidence could be made stronger, but accidents are fortuitous events which do not proclaim themselves beforehand. The evidence must be taken as it

* In *Jerominski v. Fowler*, 372 Pa. 291, 296, the plaintiff was injured on a defective step in a department store. We held that "to require inspection every two or three hours of an artery of pedestrian traffic in a busy department store is not an unreasonable requirement." The requirement for inspection in a well-frequented hotel could scarcely be much less.

is, and not as it may be conjured up for the "perfect" case.

When the plaintiff reached the bottom of the steps down which he fell headlongly, he was unconscious. The Majority Opinion graphically describes what happened: "He fell, he heard a bang, was dizzily aware of being in the hospital, and woke up eventually at home."

Thus, it was impossible for the plaintiff to make an inspection of the steps immediately after he fell. Nor was it possible for him to ask people who picked him up to make an examination of the steps. He was, we repeat, unconscious. Equally it was impossible for his daughter and son-in-law to make the investigation of the steps the night of the accident because they had no knowledge of the accident. When they did learn what had happened they went at the first practicable moment to the hotel and made the inspection to which they later testified in court.

Their testimony, if interpreted as this Court is required to interpret it, in the light most favorable to the verdict winner, conclusively proves that the defect in the metal strip existed for a sufficient period of time to give constructive notice to the hotel owner. The Majority argues, as indicated, that the plaintiff should have produced witnesses to show the condition of the steps immediately after the plaintiff's fall. The law does not demand such immediacy of inspection. In fact, the Majority Opinion itself quotes the law directly contrary to its asserted position. The Majority Opinion cites *Stais v. Sears-Roebuck & Co.*, 174 Pa. Superior Court 498, and quotes: "What will amount to constructive notice of a defect or dangerous condition existing upon a defendant's premises necessarily varies under the conditions of each case. Among the factors affecting the question are the number of persons using the premises, the frequency of such use, the nature of the defect, its location on the premises, its probable

cause, and the opportunity which defendant, as a reasonably prudent person, had to remedy it: Bremer v. W. W. Smith, 126 Pa. Superior Ct. 408, 191 A. 395. *It is not always necessary for plaintiff to produce positive testimony as to how long the defect existed.* In Oberheim v. Pennsylvania Sports and Enterprises, Inc., 358 Pa. 62, 55 A. 2d 766, Mr. Justic JONES [now Chief Justice JONES] points out that *direct proof of defendant's knowledge is not essential to the imposition of liability where the condition was a likely and foreseeable result of the manner in which the premises were being maintained and used.*"

It will also be observed here that the Majority Opinion cites what the present Chief Justice held in the case of *Oberheim v. Pennsylvania Sports and Enterprises, Inc.,* supra, and then disregards it completely.

In order to impose notice on the defendant in this case of the defect in the stairway, it was not necessary "to produce positive testimony as to how long the defect existed." That knowledge could be inferred from the circumstances in the case. That someone would inevitably trip over the raised metal stripping on the tread of the much-used step, especially because of the defective lighting at that point, was something that was foreseeable by the hotel owner.

The Majority Opinion cites the case of *Coxey v. Gaula,* 112 Pa. Superior Ct. 460, and there again, as in the *Stais,* case, it ignores the very law it advances as authority. In the *Coxey* case, the plaintiff was injured when she fell on steps in a restaurant because of a pad lying loosely on the stairway. There was evidence that, as in the case at bar, the stairway was very poorly lighted. The defendant restaurant owners argued that they had no notice of the loose pad. On this subject the Superior Court said: *"This was, therefore, a clear question of fact for the jury as to whether or not the steps were in a proper condition on the date of the*

*accident and, if defective, whether that condition had existed for a sufficient length of time to amount to constructive notice to the defendants. What length of time would be sufficient is entirely a question for the jury, varying according to the circumstances* and particularly the use which was being made of the steps. *If the pad was loose as described by the plaintiff, the jury might have inferred that it had existed a sufficient length of time to have charged defendant with constructive knowledge.*"

Then the Majority cites *Angelini v. Mansmann Co.,* 168 Pa. Superior Ct. 275, which has no application at all to the facts evident in this case. In the *Angelini* case, the plaintiff fell on steps in a store, but did not go back to inspect the steps until a month later. Her husband went to the store to inspect the steps "three or four days after the accident." Now, when we are dealing with constructive notice, time is important. Does the Majority intend to argue that there is no difference between an inspection made within 24 hours after an accident (the facts in this case) and an inspection made three or four days after an accident? Such an argument suggests that time has no units and that chronology is a mass of indivisible infinitude.

The Majority Opinion offers illustrations of cases which are admittedly unlike the one at bar and, by that dissimilarity, seeks to convince that the plaintiff here is not entitled to recover. Thus it cites *Kimble v. Mackintosh Hemphill Co.,* 359 Pa. 461, "where a roof fell on the plaintiff and he was allowed recovery because he could show a basic defect—rotted timbers— which in itself was evidence that the weakness was of long standing and should have been known by the defendant." I could offer a hundred cases different from the one at bar, but that wouldn't, or shouldn't, lessen the right of the plaintiff to an award on the facts of his own case. One does not have to have a

roof fall on his head in order to hold a verdict given him by a jury on facts which the law says entitles him to recover.

The Majority Opinion says: "Just because the nosings, or even the steps, were old and dirty and dented doesn't mean that they were also out of place or, if they were, that they had been so during their aging period or during any definite period of time. Many old, dirty, and dented things are still strong and tough."

This, I respectfully submit, is an argument in semantics. In the first place, the phrase "dirty and old and dented" was used by the witness Donald James Link, in referring to the *nosing* on the step, not the steps themselves. After this misapplication of Link's testimony, the Majority Opinion says that "many old, dirty and dented things are still strong and tough." But the question here is not how strong and tough the metal stripping was. The question is: How *long* was the defective metal stripping in place before the plaintiff tripped over it? The fact that the defective stripping was "strong and tough" reveals all the more forcibly the negligence of the defendant. It shows that the stripping was of such durable material that it could easily catch and throw a person whose foot came into contact with it.

Then, the Majority Opinion, still seeking hypotheses of escape from the unyielding, definitive and plate glass clear record, says: "The jagged and broken condition of the nosing may indeed have been caused, as plaintiff's witness suggested, by a refrigerator being dragged across it, *perhaps* during the twenty-four hours following the accident."

But an appellate court has no authority to enter a judgment n.o.v., which is the most severe, drastic, revolutionary and irrevocable termination possible of a civil lawsuit, on a *"perhaps."* Moreover, the plain-

tiff's witness did not say that a refrigerator had been dragged over the steps. He said, in describing the appearance of the curled up "jaggy" metal stripping that the metal strip was "jaggy . . . it was broken and it was jagged like a refrigerator or *something* was pulled over the top of it."

It must be obvious to any neutral mind that the witness was merely explaining that in his estimation the distorted condition of the stripping was caused by *something* heavy and cumbersome having been drawn over it. In any event he did not say *when* "a refrigerator *or something*" may have been pulled over it. Moreover, if the suppositional refrigerator had been hypothetically dragged over the stripping, as the Majority says, "perhaps, during the twenty-four hours following the accident," the bruised metal would be shiny and clean from friction and not "old and dirty."

Eight and a half years have passed since the happening of the accident which initiated this protracted litigation. It is my unswerving belief, from an exhaustive study of the record, that the two juries which have heard the evidence were justified in finding that the plaintiff's serious injuries were the result of the hotel owner's failure to exercise that care which a hotel owner, under hundreds of decisions of this Court, owes to hotel patrons.

In reversing the jury action I believe this Court errs. However, since no one assumes that this Court is infallible, it is understandable it could err once in the same case, but that it should err twice in the same case and on the same proposition of law, at the expense of a litigant who has grown old waiting for justice, is something to give one pause.

I repeat what I said at the beginning of this Dissenting Opinion, namely: If this Court is of the opinion that the plaintiff did not prove constructive notice

against the defendant, it should have, in justice, so declared at the end of the first trial.

I say that this Court has erred twice in this case. In reality, it has erred thrice because there is another distressing feature to this superannuated litigation.

On August 4, 1959, the court of common pleas entered the following orders: "And now, this 4th day of August, 1959, after argument before the Court en banc and consideration of testimony and briefs, it is hereby ordered that defendant's motion for judgment n.o.v. is refused."

"And now, this 4th day of August, 1959, after argument before the Court en banc and consideration of testimony and briefs, it is hereby ordered that defendant's motion for a new trial is refused and the Prothonotary is directed to enter judgment on the verdict upon payment of proper costs."

On the following day the plaintiff's attorney paid the verdict fee of $5. This was noted in the Fee Book Volume 12, slip number 11762, as established by the following entry: "On August 5, 1959, verdict fee paid and judgment entered on verdict in favor of William Hartigan in sum of $20,000.00".

On the same day the judgment was entered in Judgment Docket Volume 37B, page 91. It was also indexed in the current General Judgment Indices, Volume C— given name A, at page 2001.

Still on the same day the judgment was entered in Adsectum Judgment Volume 13B, page 359, and indexed in the Adsectum Judgment Indices, Sixth Series, Volume H, page 326.

And again on the same day the Prothonotary's verdict slip with the notation above indicated was filed with the other papers in the case at 2218 October Term, 1952.

On August 7, 1959, the Pittsburgh Legal Journal, under the heading: "C. P. JUDGMENTS AND LIENS," car-

ried the item: "Clark, Alice Hoerr—Wm. Hartigan—2218 Oct. '52—$20,000."

The defendant did not take her appeal to this Court until February 17, 1960, which, of course, was beyond the statutory time allowed for appeal. Thus, under this chronology of uncontradicted documentary fact, the defendant is not even properly in this Court. The plaintiff's attorney moved to quash the appeal, but this Court refused to quash, stating that although the verdict fee was paid on August 5th, although the prothonotary of the court of common pleas entered the judgment in accordance with what I have above related, he did not timely make an appropriate entry in the Appearance Docket. The Appearance Docket flatly says: "On August 5, 1959, verdict fee paid and judgment entered on verdict in favor of William Hartigan in the sum of $20,000.00".

Certainly this Court should respect the records of the courts of Allegheny County, but in this instance it does not do so because, it says that while the Appearance Docket shows the entry in question was made on August 5, 1959, it actually was not made until November 20, 1959. Let us now review the facts in this part of this much-litigated case.

Although the defendant's counsel knew by positive, personal knowledge that his motions for judgment n.o.v. and a new trial were denied on August 5, 1959, and although he well knew that if he wished to appeal to the Supreme Court he had to do so within three months after August 5, 1959, he did not bestir himself in this respect until December 9, 1959, when he filed a petition in the court of common pleas asking for a rule to show cause why the entry in the Appearance Docket, which clearly shows it was made on August 5, 1959, should not be changed to read that it was made on November 20, 1959.

Plaintiff's counsel replied to this petition averring that defendant's counsel had said to him that "the defendant had moved beyond the jurisdiction of the Court to an unknown address, that the insurance policy was not applicable to the recovery and that no further steps were going to be taken by counsel for the defendant in regard to this judgment."

Plaintiff's counsel averred further that, because of this statement by defendant's counsel, plaintiff's counsel communicated with the defendant, Alyce Hoerr Clark and learned that "she was completely unaware that the insurance company, through defendant's counsel herein, was raising any type of defense to the applicability of the insurance policy."

Plaintiff's counsel also averred that he "obtained permission from the said Alyce Hoerr Clark and her husband to contact Walter L. Riggs, Esq., and her insurance agent, William Buck, for the purposes of obtaining all necessary information with regard to the said policy."

Plaintiff's counsel said in addition that after conferring with the defendant and her husband, he wrote to general counsel for the insurance company involved, "advising him of the astounding change of position of which affiant had been informed."

The prothonotary of the court of common pleas also filed an answer to the petition of defendant's counsel. In his answer the prothonotary denied that the entry in the Appearance Docket was made on November 20, 1959, as claimed by defendant's counsel. The prothonotary averred further that: "had the defendant in the above captioned case made the usual, ordinary and reasonable examination of the indices, dockets, and records in the Prothonotary's office, that she would have been fully and completely aware that on August 5, 1959, that the verdict fee of $5.00 was paid and the judgment entered on the verdict."

Acting on defendant's counsel's petition, the court of common pleas granted a rule on the prothonotary to show cause why the record should not be amended in accordance with defendant's counsel's petition. On December 17, 1959, the court of common pleas held a hearing and took extensive testimony in the matter.

On February 11, 1960, the court of common pleas discharged the rule and stated: "After a careful review of the entire record, the Court is of the opinion that there is not sufficient evidence to support defendant's contention. It is admitted that counsel for plaintiff paid the verdict fee on August 5, 1959, and judgment was noted on the verdict slip, in the fee docket, the Adsectum Index and General Judgment Index. The clerk from the Prothonotary's office testified that he entered the judgment on the back of the verdict slip on August 5, 1959, and also on the Appearance Docket. The Court records speak for themselves and the Court should sustain them unless there is sufficient evidence to the contrary.

"In addition to this, it is to be noted that although counsel for defendant states he had the Appearance Docket checked periodically, he never examined the other dockets or the papers themselves until November 20, 1959. Had he done so, he would have discovered that plaintiff's counsel paid the verdict fee on August 5, 1959, and judgment had been entered in the other dockets."

After this formal adjudication of a matter peculiarly within the province of the local court of common pleas, this Court proceeds to evaluate the testimony of the witnesses, not having seen them or having heard them. And then, following this review it repudiates the findings of the judge who was a judge of the court of Allegheny County for twenty-eight years (he has since died) and knew the functioning machinery of the prothonotary's office, as well as he knew his right hand.

The principal witness for the defendant on this subject of changing the records of the court of common pleas was a young man Norbert Pail, a second year college student employed part time in the office of defendant's counsel and who had had no experience whatsoever in checking judgments in the prothonotary's office.

This youth testified that around the 10th of August he was directed by defendant's counsel Mr. Robinson to check the Appearance Docket in the case of *Hartigan v. Alyce Hoerr Clark*. He said he made many visits to the prothonotary's office to inspect the appearance docket, but found nothing there with regard to the entry of judgment. Under cross-examination by Ralph Smith, attorney for the prothonotary (and now Judge of Allegheny County Court), Norbert Pail revealed that he was utterly at sea in looking through the documentation in the prothonotary's office: "Q. Prior to going to work for McCamey's firm had you any experience in searching judgments and liens? A. No, I had not. Q. Had you had. any familiarity at all with the methods by which the records and dockets in the prothonotary's office are kept? A. No, I hadn't. Q. During the time from your first search in the records in the prothonotary's office for this particular judgment had you had any experience at all as a judgment searcher, or lien searcher, or record searcher? A. Not too much, no. Q. Are you familiar with the Russell Index system in the office of the prothonotary? A. You will have to define the Russell Index."

It will be recalled that the entry of the judgment was recorded in the Pittsburgh Legal Journal, which is the duly appointed and constituted paper for the publication of notices in regard to matters before, pending in, and decided by the court of common pleas. Norbert did not look in the Legal Journal which obviously would be the first place in which a person seri-

ously searching for information on the subject of judgment entries would look. "Q. Did you ever check the Pittsburgh Legal Journal to see if judgment had been entered? A. No, sir, I did not."

When, as he said, he kept looking in the Appearance Docket for an item which should obviously be there, in view of what had been told him, it did not occur to him to speak to the prothonotary or his assistant: "Q. Did you at any time call that, whether or not there was a judgment entered, to the attention of Mr. Roberts, the prothonotary? A. No. Q. You never discussed this case with him? A. No, sir."

It is a mystery to me how this Court can ignore a formal court record, authenticated by the prothonotary and affirmed by the court of common pleas, for the word of a lad who obviously was an amateur, lost in a professional man's job. This was the first time that he had been assigned to a task of this character. "Q. Is this the only case you were asked to check for a judgment being entered? A. I imagine it is. Yes, I guess it is. Q. You don't remember any other case that you were asked to check for a judgment being entered, do you? A. No."

This lad's complete inexperience and utter immaturity in approaching the subject of judgment entries in evidenced by the fact that he testified to making a pencil mark of his own in the Appearance Docket. He said it was only a "small X", but it should have been obvious that any marking by him was absolutely improper and illegal.

David H. Trushel, a young attorney in defendant's counsel's office, (member of the bar four years), testified that the first time he entered into this affair was on November 20, 1959, when he went to the original papers in the prothonotary's office, which, any lawyer really serious about getting the facts, would have done in the first place. There he found the receipt for the

verdict fee paid on August 5th. He said that he then went to a Mr. Mawhinney in the prothonotary's office and told him of the absence of the appropriate entry in the Appearance Docket, whereupon Mr. Mawhinney, according to Trushel, had a "floor man" make the missing entry and date it as of August 5th. But defendant's counsel did not call Mr. Mawhinney to corroborate this statement. The Majority Opinion, in supporting defendant's counsel's position, says: "Plaintiff argues that if defendant didn't call Mawhinney to testify it must be presumed that the witness had adverse evidence to offer, but in a case like this that sword cuts both ways: the court was entitled to every scrap of relevant testimony and the duty to call a witness, if he had any knowledge, lay equally on both sides."

But this is not a fencing match. The plaintiff was not required to draw a sword, two-edged or otherwise. It was the defendant who had the burden of repudiating a formal court record, and it is no answer to the failure of defendant's counsel to call Mr. Mawhinney to say that plaintiff's counsel could have called him. The plaintiff stood on the record. He had no obligation to call anyone.

The Majority places much stock in Trushel's testimony, but Mr. Trushel's answers under cross-examination reveal that his interest in the whole matter was a feeble one and that his efforts in arriving at the facts were quite lackadaisical: "Q. On that date did you examine the General Judgment Index? A. I did not. Q. Did you examine the Adsec. Index? A. I did not. Q. Did you examine the General Judgment blotter or docket? A. I did not. Q. Did you examine the Adsectum Judgment docket or blotter? A. I did not. Q. Did you at any time examine the Prothonotary's fee docket to see if the costs in this particular case were paid? A. I did not."

John S. Kenna is the clerk who entered the controverted item in the Appearance Docket. He said that to the best of his knowledge he made the entry on August 5, 1959. He could not assert with positive recollection the exact date he penned the entry, and this would be natural because it would be impossible for a clerk making hundreds, perhaps thousands, of entries, to remember, after the passage of a substantial period of time, just when he did write up any particular entry. However, his testimony in no way gave support to the defendant's contention that the entry was made on November 20, 1959.

The Majority Opinion says that Mr. Trushel spoke to Mr. Kenna to protest making the entry as of August 5, 1959, and that, in response, "Kenna shrugged his shoulders." There is no evidence in the record that "Kenna shrugged his shoulders." In fact, it is significant that although Trushel said in his direct examination that he had talked to Kenna, he denied later on, under cross-examination, that he had talked to Kenna at all: "Q. Did you talk to the other gentleman Mr. Mawhinney called over? A. No, I didn't." The only "other gentleman" called by Mr. Mawhinney, according to Trushel, was Kenna.

Attorneys Robinson and Sherman, defendant's and plaintiff's counsel, respectively, also testified but neither offered anything decisive on the matter of the entry in the Appearance Docket. Mr. Sherman did affirm, and certainly no one can deny, that he did pay the verdict fee the day after the lower court handed down its decision on August 4th.

Mr. Robinson's testimony would suggest that his delay in taking an appeal to this Court was due to the fact that he believed the insurance company involved had no coverage of defendant's liability. He testified: "The question that was primarily in Mr. Sherman's

mind was not the entry of judgment, but the question of coverage under the policy, and I advised Mr. Sherman on several occasions that the policy did not cover . . . to this day Mr. Sherman still doesn't know I am still refusing coverage."

Is the plaintiff in this case to be denied compensation for his grave injuries, twice awarded him by a jury, because of a controversy which seems to have insurance coverage as its focal point?

The more I dwell on this case the greater seems to be the injustice which is being inflicted on William Hartigan. No one questions that his attorney paid the verdict fee, which is all he was required to do. From that point on, the prothonotary's machinery took over. Even, if we were to assume that some clerk failed to make an entry in one book, after making numerous entries in numerous other books, why should Hartigan, who is utterly innocent of and isolated from all these matters, be the tragic victim of a clerical error?

It is difficult for me to believe that defendant's counsel was unaware that judgment had been entered on August 5th. Why else would plaintiff's counsel have assiduously tried the case, twice, if he didn't intend to pursue the matter to final judgment? If defendant's counsel were only indifferently concerned or only half serious about truly ascertaining whether judgment had been entered on the verdict he knew he had lost, all he had to do was to step into the prothonotary's office where the many books which contained the judgment entry would have shouted to him the information which he could certainly never have doubted. Or, if he did not wish to go to the prothonotary's office, although it is in the very building where he tried this case and tries cases almost daily, he only had to turn to the Pittsburgh Legal Journal in his of-

fice to get the information which he would have us believe was being hidden from him. Or he could have picked up a telephone to ask his adversary to find out if the judgment had been entered. Or he could have sent a man to do a man's errand, instead of sending an inexperienced, immature youth who apparently derived much entertainment from playing tick tack toe on the margin of the formal dockets of the court of common pleas.

As already stated, William Hartigan, the plaintiff, was 60 years of age when he plunged down the steps of the McKeesporter Hotel. Eight and a half years have passed since then. He has become old and blind awaiting justice in this case. Why should he now be deprived of what is his due, as established by two juries, because of a slight oversight in the machinery of the prothonotary's office, if there was an oversight, and because of the colossal indifference of defendant's counsel to consult the documentary records in the prothonotary's office which repletedly told of the entry of the judgment? Why should this indifference of defendant's counsel to the court records be turned into an advantage for him and his insurance client?

But over and above this, why should William Hartigan be denied an award two juries have given him? Although I have devoted considerable space to discussing the matter of the judgment entry, this is not because I regard it as the outstanding feature of this case. I have been compelled to discuss the matter at length because the Majority has discussed it at length. But I want to emphasize that the crucial feature of this case is this Court's entering of judgment n.o.v. The matter of the judgment entry in the Appearance Docket in the Court below is important only because if this Court had not ordered an amendment of the records of the prothonotary's office, this Court would have had no jurisdiction to consider the defendant's appeal

at all because the statutory period for appeal had expired.

And I wish to repeat that the record emphatically demonstrates that, under the facts and the law, the jury was justified in finding that the hotel owner did have constructive notice of the fateful torn and twisted metal stripping attached to the telltale step. The record also emphatically demonstrates that this Court, in considering the case on the first appeal, knew, or should have known, if its present ruling is correct, that the plaintiff had not shown constructive notice. In that event, the Court should have so notified the plaintiff and that would have ended this protracted litigation. While I am aware that the doctrine of estoppel cannot apply to a court, yet it seems to me that there is some kind of moral obligation on an appellate court when it once decides that a litigant has a legal claim and orders him to proceed in court to litigate that claim, not to tell him three years later that he has no legal claim.

This Court's offering to the plaintiff three years ago a hope which it knew he could never realize amounts, in my estimation, to a wrong which loses none of its sting because it is inflicted by the highest court in our Commonwealth.

I end as I began this Dissenting Opinion. The decision of the Court in this case is that type of decision which from time to time shakes the faith of litigants in the reliability of the Courts. Regretful as I am to have to write in this fashion, I have some slight consolation in the fact that I can disassociate myself, by this dissent, from the gross injustice being recorded by the Majority Opinion.